The United States Court of Appeals for the 11th Circuit is now open to court into law. God save the United States and His Honorable Court. Please be seated. Before we begin, Judge Carnes and I would like to say we're delighted to have joining us on the bench today the Honorable Beth Bloom from the United States District Court for the Southern District of Florida. It's a little chillier up here than it is down there. Thank you, Judge. Well, we'll begin with Midwest Feeders v. Regions Bank. Mr. Sandberg. Thank you, Your Honor. May it please the Court. This is a case of facilitated theft. Over $4 million was stolen from my client in a check-writing scheme, and that feat could not have been accomplished without the aid and assistance of a friendly bank. I'm willing to wager that no one in this courtroom has ever written a five- or six-figure check to someone and then immediately asked that someone to endorse that check right back to you so you can then go take a check that you wrote from your account to have endorsed back to you to deposit into your own account. It is beyond suspicious to present a check like that. We all agree it was pretty bad. Pardon me? It was pretty atrocious. And there would be no problem if the account on which the check was written, if the entity holding that account were suing the bank, but they're not, correct? The entity holding the account? Yes, the entity's account on which the check was written is not suing the Regions Bank. The entity whose name appears on the account is not suing the bank. The entity that owns the account and had the rights to it is suing the bank. There's no conceivable business or personal purpose for a check like that. They're not used in the cattle industry or in any industry. And in banking, they give labels to checks like that, like red flag or irregular on its face or commercially unreasonable. Yet Regions Bank took hundreds of these checks, totaling tens of millions of dollars. What's the root of their duty to your client? Sorry, Your Honor, what? What is the basis for the duty that allegedly was breached toward your client? There are two bases, Your Honor, one statutory and one common law negligence. The statutory basis is in Section 11-3-404-D, Subsection D of the Official Code of Georgia. And then there's also, and that duty is to exercise reasonable care in accepting an instrument. And the other duty is to exercise reasonable commercial standards of fair dealing. The first one is a duty to whom? It's a duty to the person bearing the loss of the failure to exercise ordinary care. But is there any evidence in the record that Midwest owned the Alva account? Well, there's no evidence in the record. Well, it's not framed by the pleadings. Is there anything within the four corners of the complaint that Midwest was actually the owner of the Alva account? We believe that's what's pled, Your Honor. Midwest set up the account. It funded it. It entered it into a deposit agreement. And then under that deposit agreement, the thief in this case was entitled to write checks and have checks in that thief's name written from the account. But Midwest definitely had an intangible right to the funds themselves and the proceeds of the checks. We are not claiming, contrary to what's been argued, that Regions Bank had an obligation to investigate or to pry into Mrs. Mosley's affairs or to take extraordinary measures in the opening of her account. All Regions had to do was what any ordinary bank does, what happens all the time when irregular instruments are presented, and that is to simply decline to accept the check. That alone would have deprived Mrs. Mosley of the linchpin of her scheme. And we believe that the question before this court, well, first of all, instead of doing that, Regions Bank facilitated the theft. And the question before the court is whether Regions can be held accountable for doing that. And we believe that Georgia law supplies at least three claims for relief to hold Regions accountable. First, as I mentioned before, under Section 404D. Second, common law negligence. And third, conversion. For our Section 404D claim, all we are asking this court to do is apply the plain language of the statute. Nothing more. That person bearing the loss answer I gave before comes directly from the statute. For our negligence claim, all we're asking the court to do is to apply a recognized duty to the applicable two banks in these circumstances and to let the facts of the case play out to determine the extent and how it applies to Regions. And for our conversion claim, all we're asking the court to do is to recognize two already recognized property rights, both by Section 113420 of Georgia's Code and in the common law. As I noted before, in Section 404D, that statute expressly extends standing to the person bearing the loss. That language is the operative language for statutory purposes. It's not cherry-picked. It's out for any particular purpose other than to show standing. This court, like all courts, should accord that language its ordinary meaning and assume that the Georgia legislature meant when it said person bearing the loss, it meant a person bearing the loss in the plainest and most ordinary terms possible, that it shouldn't insert a person entitled to enforce the instrument. Suppose she had taken the money and given it to Merrill Lynch to invest in the stock market. Would Merrill Lynch be liable? Not if Merrill Lynch wasn't taking a check that was written by her. Oh, they took a check. She wrote a check on that bank account just like she did with Regions and gave it to Merrill Lynch and they put it in her account. If Merrill Lynch was functioning as a bank and subject to order. Merrill Lynch is functioning like a broker. Probably not unless Merrill Lynch was assuming the duties owed under 11-3-404 and under negligence duties applicable to banks. This scheme was a banking and check writing scheme. It didn't originate at a feed yard or a cattle auction or a brokerage house. It originated and was facilitated solely through a bank. And it was the checks themselves and it was the business, the checks themselves through which the scheme was facilitated and it was a business, Regions Bank, that is in the business of scrutinizing and reviewing and processing checks that accepted it and accepted the corresponding duties. I don't know in your hypothetical that Merrill Lynch would necessarily have assumed those duties. The only way around the plain lay. Mostly cattle auction would have no problem, I gather. Again, my first question, the check was written on their account. They've not sued Regions Bank for its conduct? Not to my knowledge, no. And they are what the banks understand to be the owner of the account, correct? I'm sorry, who did you say that at first? Mosley Cattle Auction. And then, of course, there's the Mosley account at Regions. Mosley Cattle Auction has rights under the deposit agreement to write checks from the account funded by them. But, no, Mosley Cattle Auction has not sued Regions Bank to my knowledge. But my understanding is you, as far as the banks know, you're not a customer on that particular account. You may have deposited money into it, too, but the bank at Alva is not aware that you were a customer. I gather Regions wouldn't have been aware that you were a customer as well. Is that correct? We have no evidence at this time showing that Regions was aware that Midwest was not a customer, correct. And Midwest was not a customer of Regions Bank, correct. Do you have any case authority that would allow recovery for essentially a non-customer on an account such as you? Well, we have a statute that extends it to any person bearing the loss, customer or no customer, and we have the Gerber case and we have the Coulter case. The Gerber case recognizes the duty applicable to banks when presented with checks that are irregular on their face and not made to the person, you know, not being deposited in the account of the payee. 11-3301 of the Georgia Code says the person entitled to enforce an instrument means the holder of the instrument. A non-holder in possession of the instrument or a person not in possession who's entitled to enforce it pursuant to 11-3309, you don't meet any of those categories, do you? That's correct, Your Honor, and we are not claiming person entitled to enforce status, and neither did the Georgia legislature when it sat down and decided who should be granted a claim under 11-3404-D. The Georgia legislature uses that language and that definition in at least nine other statutes that we're aware of, but when it sat down to decide who gets the right to assert a claim under this statute, it deliberately left out person entitled to enforce an instrument and deliberately included person bearing the loss, which is much broader. You would argue, I suppose, that if some other entity deposited money in that bank pursuant to an arrangement with the account holder and it was siphoned off and the same thing happened, they'd have a cause of action. If they're a person bearing the loss and— Well, sure, anybody who—they have an arrangement with— the money's supposed to be used for a certain thing, sort of entrusted, and so they'd have a claim. Yes, but I would submit that it's not as factually broad as that might sound and that almost every case cited by Regions and, frankly, by us bears down to the facts of the case, and there certainly could be facts where that's not true. I understand, but somebody similarly situated to you would have a claim. Pardon me? Somebody similarly situated to your client would have a claim. Yes, Your Honor. Let me try it this way, and I know you're over time, but let me ask you this question. 11-3420 sets out who can bring an action for conversion under the UCC as adopted by Georgia, and it indicates it's the issuer or acceptor of the instrument, not you, a payee in Dorsey who did not receive delivery of the instrument, not you. So I'm really having trouble understanding how, as aggrieved as you are and as awful as what this was, how you can proceed on conversion under Georgia law. Your Honor, my understanding of this section you're reviewing is a recitation of those for whom a claim may not be brought. Are you looking at subsection A1 and 2? I'm looking at 11-3420A. Right, and those two categories, the first two… Excuse me, may not be brought. Yeah, and we don't fit into the exclusion there, which by definition and by statutory construction means we fit into the inclusion. But the two categories of people you just brought up under the statute are those that the Georgia legislature decided they're the ones that they singled out as you can't… We're not covered by that and you say… No, we're not within the class that the Georgia legislature has segregated as not being… Thank you. You say some rebuttal time. Thank you. Mr. Hawley. Thank you and good morning, Judge Tillflat, Judge Karnes, Judge Bloom. May it please the court, Bill Hawley for Appalachian Regents Bank. This commercial paper case was resolved below and ought to be resolved here on a straightforward application of the Uniform Commercial Code. That's why we have commercial paper rules. The claim is that the appellant seeks to challenge Regents Bank's acceptance for deposit of checks presented by Regents' own customer and deposited into that same customer's account at Regents Bank.  And the appellant is not a person entitled to enforce rights as to these checks. The controlling provision is codified at 11.3.301, Section 3.301 of the Uniform Commercial Code. 3.301 defines who may challenge the checks at issue, but those persons don't include the appellant. And that is for sound legislative policy. We submit to you that the two most important pages of the record are pages 12 and 13. And the reason is it addresses Judge Bloom's question and Judge Karnes' question because a copy of the check that was presented to Regents Bank lies therein. And you will see that it is commercial paper. You will see that on that check the appellant's name appears nowhere. Instead, the customer of Regents Bank appears as if it has written the check. There is a blank endorsement of the payee, an endorsement for deposit into Regents Bank's customer's account, commercial paper. Banks look at the paper that's presented to them. Each of the panel members here has addressed UCC cases in the past, and in some instances they have found reason to depart from the code, but only when there was some other type of relationship between the party that claims that it bared a loss and the bank. Yes, Judge. Well, counsel just stated to the court that the complaint alleges that Midwest owned the Alva account. If, in fact, that's pled, then isn't there an interest in the funds backing the instrument as opposed to interest in the instrument itself? Correct, Your Honor. And you draw the exact distinction that was drawn by District Judge Bramlett in addressing a copycat scheme that was perpetrated on the same appellant here in the Bank of Franklin case, which was cited to you, and also as noted by the Seventh Circuit in the American National Insurance Company case. There is a difference between an interest in the funds backing the instrument and the instrument. Again, I hate to be simplistic, but that's why we call it commercial paper. It's not the duty of the bank to try to figure out whether there is a separate agreement. And, Your Honor, I don't know whether the allegation of ownership is there. I do believe, though, that the checks show that anyone receiving that paper would have no knowledge of that. Well, the argument is they took a risk. If they owned the account, they took a risk under negotiable instruments laws, they would say. Exactly. That they'd lose the money. Exactly, Your Honor. And we would submit to you that the Bank of Franklin case is important for another reason that goes to Judge Choflat's point, and that is it's not coincidence that this same appellant entered into these arrangements and lost money more than once. And the reason is because they didn't protect itself in those ancillary contracts that are not at issue here. They do have claims against the people they entered into the contracts with. At page one of our reply brief, we indicate their claim, which pursued it against Moseley Cattle. What they don't have is a commercial paper claim, and that's what's so important here. As Judge Adams said also, you cannot confuse an interest in the funds backing the checks with an interest in the checks themselves. So many plaintiffs have made that mistake, and in every instance in which they've done that, they have not been allowed to bring either a UCC claim or a common law claim. Appellant's main argument is that you should pluck from 3404D, what we call the imposter rule, a clause within a phrase, within a sentence, within an entire statutory scheme, and say, okay, person bearing the loss wipes out 113301. Well, we know you can't do that for several reasons. One, the UCC is not read in a vacuum. It is a comprehensive scheme. There are a number of different statutes that define what a bank's duties and obligations are when it receives a check. There are at least 12, and you can't take one and pluck a phrase out of it. We know that. Second, that argument is internally inconsistent. Every time that the appellant makes that argument, they leave out the predecessor to the same sentence in which they're arguing about. The sentence starts with respect to an instrument to which subsection A or B of this code section applies, dot, dot, dot, dot, dot, person bearing the loss. Well, subsection A of that statute, 3404D, talks about issuers of checks. As Judge Carnes noted, they're not an issuer of the check. Subsection B talks about holders, persons in possession of the check. Well, as Judge Carnes elicited, they are not a holder, a person in possession of the check. So even if you accept their argument that you could somehow read 3404D or that one sentence separately away from the entire code, internally their argument makes no sense because the persons bearing the loss within that sentence would have to be the issuer or the holder who are in subsection A and subsection B. It is a creative argument, but it fails. And that's what Judge Branlint did. He looked at it and he said, in addition to that, I'm going to go to the comments, which, as we know in Georgia, we can do. And he looked at all the examples in the comments, and all of the examples were drawers, issuers, or persons who were payees and possessed the check. And that is because no one drafting the code intended to create this wide loophole. And ask yourself this. The code has been around since 1951, 66 years. In 66 years, no court anywhere in the country has ever accepted the argument that's been made here and found that 3404D, persons bearing the loss, opens up an unlimited category to sue anyone. Merrill Lynch, anyone who took this check. If someone gave me money tomorrow and said, put this in your account and buy a Christmas present for my child, if instead I put the money in the account and I go and I have a nice dinner, does the restaurant have to pay? Of course not. That's why the argument fails. It's commercial paper. The 113420 argument is equally insufficient. And the best analysis on that is the most recent analysis by a circuit court, and that is in the American National Insurance Company case. Circuit Judge Wood in there. And this is what they had to say about that argument, which applies to the argument here. The novel interpretation of the familiar drawer-drawee and Dorsey-payee relationship is unprecedented and for good reason. It betrays the fundamental axiom of negotiable instruments that banks must pay the payee. And that's what this case is about. You cannot look to things that Regions Bank didn't know. You can look to pages 12 and 13, and you can look to the check, and you can say, what did Regions Bank reasonably know when it processed the commercial paper? And the answer is it had no clue that Midwest Feeders ever existed. And the fault, if there is one, in the loss was not related to Regions Bank's lack of knowledge. It was related to the appellant's lack of having control over those funds. Once it relinquished them to Mosley Cattle into an account in Mosley Cattle's name with Mosley Cattle's address on it in Georgia and allowed Mosley Cattle to write checks on it because then the laws of commercial paper take over. There's been some briefing about constitutional standing. I don't know, frankly, what the right answer is. Courts have appeared to look at this issue in two different ways. They have either analyzed the case as a strict UCC case and said, you plaintiff don't fall within the categories of people able to enforce checks, and this is a comprehensive scheme, so therefore the rest of your common law claims are preempted, and they've done that analysis. Or they've gone to Lujan, and they've gone to this court's ruling in Cox Cable, and the quote, no legally cognizable injury arises unless an interest is protected by statute or otherwise. And they say, if you can't show that you fit within this statutory scheme, then you lack standing. After Lexmark, I'm not sure if we have parental standing. This isn't a challenge on a statute or some such thing. All that the statute does is give rise to an obligation. So the standing issue is just— Thank you, Your Honor. I'll move on from that. That's not worth talking about. You end up in the same place regardless. The question of whether it got a cause of action, pure and simple. Exactly. And then there's a question of, all right, if you don't have the cause of action under the UCC, can you bring this common law cause of action? Judge Choflat had an interesting question regarding to Merrill Lynch that shows why you can't bring that common law cause of action. Because if you could, you would supplant all the protections both of banks and the definitions of parties under how commercial paper works, and you would have different statutes of limitation depending on what type of common law claim you could rise. There would be different burdens of proof. All of the reasons why perhaps the first court in—the first federal court in Georgia to address this did an extensive analysis, Judge Beverly Martin, when she sat in the Northern District of Georgia in the Promisor case. And she looked at this whole question of whether you could have these separate duties, and she recognized, as every court has that has looked at it, when you have a statutory scheme that comprehensively defines the duties and obligations with respect to certain transactions, and however we look at it, we certainly have to agree that with respect to banks taking commercial paper checks, there is a comprehensive scheme that defines what they can and can't do. So when that scheme exists, then you cannot bring common law claims because it would serve to thwart the common law—excuse me, thwart the UCC, not supplement it. We've cited to you cases in Georgia on that principle, the Dudley case. We've cited to you cases from the district court. We've cited to you cases from other circuit courts. That is a very established principle. And finally, the question of lack of duty. Judge Abrams, rightfully so, said that that is a question that has not yet been addressed by the Supreme Court of Georgia. Therefore, she had to make an eerie guess. My first point to you, and it goes to what Judge Joe Flatt said a moment ago, I don't think you need to go there to resolve this case to determine whether a bank owes a duty to a non-customer. However, we submit to you that Judge Abrams absolutely made the right decision there. Every decision in Georgia that is cited within the briefing, and Georgia's conservative view of application of the UCC, Georgia's application of the examples that are set forth in the comments to the UCC, all point to the fact that they would not allow a customer, or excuse me, a non-customer, to have a duty imposed upon them that is a general duty. There are very good reasons for that. And that's why we cited to you law that says that for the courts that have looked at it, the rule that there is no duty owed to a non-customer is almost universal. Again, we submit this panel need not go there. I think we understand your position. Okay. Well, Your Honor, with that said, then I will end my argument. I will just say that the appellate asks this court, as you well know, to do what no court has ever done so far as we're aware. Thank you. Mr. Zandberg. Your Honor, Regents Bank dwells on this language in UCC 113301 about the person entitled to enforce the instrument. And there is a difference between a person entitled to enforce an instrument and entitled to bear the loss of a failure to exercise ordinary care. You can argue all day long about the wisdom or policy implications about excluding a person entitled to enforce an instrument from Section 404D, but we can't argue about what the statute says. And we have to assume that it was excluded thoughtfully and intentionally. This argument that you somehow have to insert that language into 404D to harmonize the statute is incorrect. You impare materia or reading hard statutes harmoniously does not mean that you go search for conflicts where none exist. It does not mean that you ignore plain language, and it does not mean that you insert nonexistent statutory language into 404D. Persons entitled to enforce instruments can continue being persons entitled to enforce instruments, and all of the other sections of the UCC where the Georgia Code or where the Georgia legislature actually chose to include that can continue operating regardless of whether this court allows this case to proceed past the pleading stage. I would like to address one claim that no court in 66 years has ever recognized this type of a cause of action under 404D. It's actually been a little less than that. The current version of 404D arose out of amendments in 1996, and that was one of the fundamental flaws in the Promisor case from an unpublished district court opinion in Florida. The court in that case used a 1987 case, which in turn used a prior version of the code, not the current comparative fault scheme in 404D. And so in that time, though, since 1996, in addition to having no court that says you can pursue a claim like ours, no court said you can't either. But what we do have is a legislative and case law mandate that remedial statutes are to be pursued or construed broadly and in favor of allowing claims to go forward. I would note that all of the cases on the negligence issue that come from Georgia that were cited by regions, if you read those closely, they all have one common thread, and that's that they have discovery and proof and a factual record. And if the claimants in those cases fail, if the court found in favor of the bank in those cases, it's for lack of evidence or lack of proof. And in many of those cases, there was actually a jury trial. And so to say that those cases stand for the proposition that a claim of negligence in a unique situation like ours has to stop on its track at the pleading stage is incorrect. Thank you, Your Honors. Thank you. Thank you. Go to the next case. Otto Kumpf, stainless steel versus cover chain.